JUSTICE RICE,
concurring.
¶33 I concur with the Court’s opinion. Although the Court reasons that Boyer is inapplicable, Opinion, ¶ 16, I believe that decision provides key support for the result here and enhances our rationale. As the Court notes, the “discrete inquiries” the United States Supreme Court has mandated be made in this case include whether “a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.” Opinion, ¶ 12. The Court properly reasons that “[a] hunter’s expectation upon pulling into a game check station is that he will be required to spend some time answering questions and waiting while the warden checks his license and other documents proving that a legal harvest has occurred.” Opinion, ¶ 18. In Boyer, we analyzed this same expectation at length in the context of the privilege to fish. In upholding the warden’s inspection of the defendant’s catch in that case, we held that our system of wildlife protection was rooted in the constitutional protections of the environment, Boyer, ¶¶ 22-23, and explained as follows:
Our holding today should come as no surprise to outdoor enthusiasts. As alluded above, the Montana Fishing Regulations inform anglers of the requirement to produce their license and catch upon demand. To fish is a privilege accorded by the State, not a private right. Anglers are responsible for knowing the laws pertaining to their sport. See State v. Huebner (1992), 252 Mont. 184, 188, 827 P.2d 1260, 1263. In complying with the well established license requirements, anglers acknowledge the prospect of at least some governmental intrusion into their activities. In engaging in this highly regulated activity, anglers must assume the burdens of the sport as well as its benefits.... In this capacity, game wardens are acting not only as law enforcement officers, but as public trustees protecting and conserving Montana's wildlife and habitat for all of its citizens.
Boyer, ¶ 24.
¶34 Just as for the fishermen at issue in Boyer, there are additional burdens that hunters undertake when they choose to participate in the highly regulated sport—and privilege—of hunting, and they must expect “at least some governmental intrusion into their activities.” Boyer, ¶ 24. I believe that this expectation, one imposed as a matter of law, makes such roadside game inspection checkpoints as the one in this case a matter of ordinary course for the hunter that weighs *48 against the argument that such stops and inquiries constitute custodial interrogations.
¶35 I concur.